## PABST BREWING CO., Respondent, *v.* MONTANA BREWING CO., Appellant.

[Submitted February 28, 1897.    Decided March 15, 1897.]

*Contracts—Interpretation—Rules of Court.*

Contracts—*Interpretation.*—S, who had conveyed to the defendant corporation land to which he did not have perfect title, deposited stock in escrow the terms of which provided that, if S at any time when the title could be perfected failed to make the payments necessary to obtain the deed, the defendant might make the payment, and should thereupon be entitled to so much of the stock as should at its then cash value be equal to the amount so paid by it. *Held,* that when S failed to make payment, defendant might do so, and that in the absence of fraud S was not entitled to notice.

Same.—Under such a contract neither S nor his assignee, the plaintiff, was entitled to recover the full amount of stock in escrow upon tendering to defendant the amount which it had paid to perfect title.

Practice—*Rules.*—The object of rules of court is to facilitate the dispatch of business; they cannot be invoked to bar a right unless a failure to comply with them is clear.

*Appeal from District Court, Cascade County.    C. H. Benton, Judge.*

Action by the Pabst Brewing Company against the Montana Brewing Company and another. From a judgment in favor of plaintiff, and from an order denying a new trial, the defendant Montana Brewing Company appeals. Reversed.

Statement of the case by the justice delivering the opinion.

This was an action for the recovery of 1,000 shares of the capital stock of the Montana Brewing Company, a corporation doing business in Great Falls, Mont. The facts necessary for the statement, so far as this appeal is concerned, are substantially as follows: Schmitz and other persons associated with him had a written contract, under the terms of which within a certain time they were to erect a brewery on a certain town lot, and to pay therefor the sum of $5,000 to the owner, the Great Falls Water-Power & Townsite Company, and upon these conditions being complied with the said last-named company was to give them a good and sufficient deed for said lot.

In this contract April 8, 1894, was the limit of time within which the brewery should be erected and the $5,000 paid; but there was a provision, also, that, if the brewery should be built and the money paid before said date, the townsite company would execute its deed for the lot prior to April 8, 1894. Soon after entering into this contract, Schmitz and his associates organized the Montana Brewing Company. They then entered into a written contract with the Montana Brewing Company, wherein it was agreed that the said company should erect the brewery under the first contract, and issue them 5,000 shares of its capital stock. The second contract contained, also, the following provision: "It is further agreed between the parties hereto that the said parties of the first part (Schmitz et al.) shall at the earliest possible date procure a deed, and perfect their title to the land hereinabove described; and should, at any time when the same can be perfected, the parties of the first part hereto refuse to or neglect to make the payments necessary, at the date mentioned therefor, on the said contract between the Great Falls Water-Power & Townsite company and the parties of the first part hereto, the said Montana Brewing Company shall have the right and privilege of making said payments itself, and perfecting the conveyance hereinabove referred to from the Great Falls Water-Power & Townsite Company to A. F. Schmitz and Joseph Trimborn; and there shall be deducted from the five thousand shares of the capital stock of the said company so placed in escrow a sufficient amount thereof, which at the cash value of said stock at the said time will be equal to the amount so required to be expended by the Montana Brewing Company to perfect said title, which the said trustee is authorized to deliver over to said company upon affidavit being made by the president of the company to that effect." Under this agreement Schmitz and his associates placed in escrow a deed to the lot, and 5,000 shares of the capital stock of the Montana Brewing Company were also placed in escrow. The holder as trustee of this deed and these shares of stock, one Johnson, during the period in which this controversy arose, was an

officer of the Montana Brewing Company.   Upon December
11, 1893, the Montana Brewing Company had erected a brew-
ery, but there was still due from Schmitz, of the $5,000 to be
paid to the townsite company, the sum of $524.60.   This
amount was paid by the Montana Brewing Company, and
thereupon a deed was executed from the townsite company to
Schmitz and the persons interested therein, and the one from
them to the Montana Brewing Company was delivered.   Upon
demand and affidavit filed, the trustee who held the 5,000
shares of stock in escrow delivered Schmitz's proportionate
share of the same, namely, 1,000 shares, to the Montana
Brewing Company.   Meanwhile, on August 19, 1893, Schmitz
had assigned 1,000 shares in the Montana Brewing Company
to the Pabst Brewing Company, of Milwaukee, Wis.   The
Pabst Brewing Company brought suit against the Montana
Brewing Company and the trustee or holder of the instruments
in escrow to recover the 1,000 shares of stock assigned to it.
It offered in its complaint to pay anything due on said stock
which the Montana Brewing Company might have advanced in
payment of the lot on which the brewery was erected to the
townsite company.   To this suit one Webster was also made a
defendant.   Webster, on December 20, 1893, as a creditor of
Schmitz, had attached certain money ($1,500) held by the Mon-
tana Brewing Company to the credit of Schmitz.   In its answer
the Montana Brewing Company admitted that it held $1,500
belonging to Schmitz.   Upon the trial it appeared in the evi-
dence that, after the organization of the Montana Brewing
Company, Schmitz and the other incorporators had agreed to
advance money to the company for the purpose of enabling
it, as Schmitz testified, to meet its obligations and require-
ments for erecting the brewery and paying for the lot, but, as
the other incorporators testified, upon an express agreement
that each one of the incorporators was to receive 1,000 shares
of the capital stock upon payment, each, of $5,000, and not
until such payment,—the money so received to be used in the
erection of the brewery by the company, and not for payments
due on the lot.   Schmitz admitted in his testimony that he

was to be repaid for what moneys he should advance under the last aforesaid agreement in stock, but claimed that each incorporator had the privilege of taking only so much stock as he might desire. Schmitz had paid to the Montana Brewing Company $1,500 prior to August 19, 1893, when he assigned to the Pabst Brewing Company. In behalf of plaintiff, the Pabst Brewing Company, a witness testified that, after the assignment of stock to it by Schmitz, he had demanded of the trustee, Johnson, some time in August or September, 1893, the 1,000 shares of stock, and had offered to pay what was due thereon, he did not know, because the trustee, Johnson, who was an officer of the corporation, would not inform him, how much was due on the stock, and made no tender of any money. Schmitz, who also testified in behalf of plaintiff, stated that no demand had been made on him to pay his share of what remained due on the purchase price of the lot. The testimony as to the value of the stock of the Montana Brewing Company on December 11, 1893, was vague in character. It appears that at said date there was no sale for it, and therefore no market price. Prior thereto, however, sales had been made of stock at the rate of $5 per share, and even as high as $10 per share. The defendant Webster disclaimed any interest in the 1,000 shares of the stock plaintiff claimed Schmitz had assigned to it. The trial court made no special findings, but decided that, upon the payment by the Pabst Brewing Company of $524.60, the Montana Brewing Company should assign to it 1,000 shares of its capital stock. The appeal is from an order denying a motion for a new trial, and the judgment in favor of plaintiff.

*Leslie & Downing* and *R. W. Berry*, for Appellant.

*A. J. Shores* and *Douglas Martin*, for Respondent.

Buck, J.—It is insisted that the alleged errors relied upon for reversal of this case are not set forth in appellant's brief in the manner required by subdivision 3 of rule 5 of this court and hence should not be considered. The main object of this

and similar rules is to facilitate the dispatch of business. Such rules cannot be invoked to bar a right unless a failure to comply with them is clear. After inspection of the brief we are of opinion that, while it may be somewhat defective, it nevertheless sufficiently calls attention to the errors assigned in the statement on motion for a new trial.

It is apparent from the decision of the court below that the trial judge found against respondent's contention that the Montana Brewing Company should have paid the sum of $524.60 due on the purchase price of the townsite lot with the funds in its hands belonging to Schmitz. If this were not true, the decree would not have directed respondent to pay that sum as a condition precedent to the right to have transferred to it the 1,000 shares of stock. The contract between the Montana Brewing Company and Schmitz et al. bound the latter to procure a title to the townsite lot as soon as possible, and provided expressly that, in the event of a refusal or neglect to procure such title, the Montana Brewing Company might pay whatever balance was due the townsite company, and deduct from the shares of the capital stock in escrow a sufficient amount of said stock, which, at the cash value of said stock at the time of such payment, would be equal thereto. There is no ambiguity in this last mentioned provision of the contract, and on what theory the lower court ordered the entire 1,000 shares of stock to be transferred to the respondent we are unable to determine. It clearly ignored the contract provision, and in doing so committed error. If, too, the lower court found the value of the stock of the Montana Brewing Company to be one dollar per share on December 11, 1893, it erred in this respect also. The evidence was that prior to said date shares of said stock had been sold at a much greater rate than one dollar per share, and that on December 11, 1893, there was absolutely no market sale for it. It does not follow that, because there is temporarily no sale for property, it is without value; and, under testimony showing such a condition of affairs, a court has no right to find arbitrarily that property so situated is of a certain value.

Appellant had a right to repayment of the $524.60 expended in procuring a title to the townsite lot in stock of the value thereof on December 11, 1893. Respondent, as assignee of Schmitz, had no greater interest in the 1,000 shares of the stock in escrow than its assignor. Schmitz had bound himself to procure title to the townsite lot "at the earliest possible date." This he neglected to do. He was not entitled to any notice, nor was his assignee, of the time when it was possible to procure a deed to the lot. The respondent should have ascertained that fact itself as a part of its assignor's contract obligation. The pleadings do not allege any fraud, nor from the evidence in the record is any fraud disclosed, whereby respondent was prevented from a compliance with the terms of Schmitz's express engagement to procure a title to the townsite lot at the earliest possible date.

It is suggested in his brief that respondent would be entitled to any dividends paid on the assigned Schmitz stock, or so much thereof as ought to be transferred to it. With this we agree. On such shares of the said 1,000 shares of stock as it may be entitled to after the amount to be deducted by the Montana Brewing Company at the cash value of the stock on December 11, 1893, is ascertained, all dividends received by the Montana Brewing Company should belong to respondent. The record, however, does not disclose that any dividends were ever paid, and we mention this only for the future guidance of the court below in the adjustment of this controversy, if any dividends were ever paid.

The order denying the motion for a new trial, and the judgment, are reversed, and the cause is remanded for a new trial in accordance with the views herein expressed.

*Reversed and Remanded.*

HUNT, J., concurs. PEMBERTON, C. J., not sitting.